UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Docket No.: 0422 1:22CR00048-001 |
| | ) |
| BRIAN SCOTT McGALEM, | ) The Honorable Anthony J. Trenga |
| Defendant. | ) |

**DEFENDANT'S POSITION ON SENTENCING**

Pursuant to Title 18 U.S.C. § 3553 (a), Federal Rules of Criminal Procedure 32, and Section 6A1.3 of the United States Sentencing Guidelines, the Defendant, BRIAN McGALEM, by and through his attorney, Jessica Richardson, states that he has received and reviewed the Pre-Sentence Report ("PSR") prepared in this case and has no objections to the PSR's calculation of the advisory Guidelines range.

On March 17, 2022, McGalem pled guilty to one count of Attempted Production of Child Pornography in violation of 18 U.S.C. §2251(a) and (3) and one count of Possession of Child Pornography in violation of 18 U.S.C. §2252(a)(4) and (b)(2). Given his background, lack of significant criminal history, and acceptance of responsibility, a sentence of fifteen years, the

mandatory minimum in this instance, is sufficient, but not greater than necessary, to comply with the purposes enunciated by Congress in 18 U.S.C. §3553 (a) (2).

## BACKGROUND

Brian Scott McGalem was born to Victoria and Richard C. McGalem in Fairfax, Virginia on December 27th, 1997. Brian was the third and final child of the couple's three boys. His brother, Richard, called "Ricky," was four years older than him. His brother, Kendrick, called "Kenny," was the middle child, and two years older than him. And while Victoria and Richard, Bolivian immigrants whose values and belief systems tended to lean more conservative, had hoped that their youngest child would be a daughter, they were nevertheless delighted when Brian entered their ranks.

Victoria McGalem had come to the United States in 1989. She'd been diagnosed with hypothyroidism and her father believed that her prospects for more advantageous treatment lay in American healthcare. Richard McGalem had emigrated to the United States at the age of 16 with his family in search of the American Dream. The McGalems had fled authoritarian rule and devastating economic crises, and thought that their children's only hope for a promising future was abroad, far from the political and social unrest plaguing their homeland. Victoria and Richard crossed paths in 1990 when a mutual friend thought their shared Bolivian heritage would assuage some of the loneliness haunting them both. And their friend had been right. The pair were married in 1991. They were inseparable from that day forward. Their son, Ricky, came in 1993. He was joined by Kenny in 1995. Their little family became complete with the birth of Brian in 1997.

Brian was a precocious child. While being the youngest of three brothers might have otherwise made him the brunt of their bullying and pranks, Brian was unusually gifted with wit, and would often turn the tables on them with sassy barbs of his own. "He always kept us laughing," Victoria remembers. "Ricky and Kenny tried many times to tell him what to do, to boss him around, but Brian would always get the better of them. No one could ever be too mad or annoyed at him for long—he was too funny." The reality was that Brian was often left to the care of his brothers. Richard McGalem's job as an administrative assistant at an engineering school kept him away well into the evening, most days. He managed the school's computer systems and technology classrooms, so the demands on his time were great. Early on, Victoria had been a medical technician at a local hospital, but a fireworks accident involving middle child, Kenny, had led her to an emergency room visit and chance meeting with a managing nurse. The nurse had informed her of an EMT position that had recently become available. After the two talked for several hours, she agreed to submit Victoria's name for the position. Not long after, Victoria found herself fully employed as an emergency medical technician.

Victoria's new job meant that her hours were even worse than Richard's, and she was called away for long stretches of time. This absence created remarkable distance between the mother and her sons. The younger boys were often parented by their eldest brother, which put tremendous pressure on Ricky and created significant guilt for Victoria. She worried over Brian the most. He'd been a confident toddler, often making a show of appearing strong and self-assured in the shadow of his older brothers. But his entry into school brought a different set of problems. The sweet boy who'd run lovingly into his father's arms, gifting him with freshly-picked dandelions after daycare, was different now—smaller somehow. He'd always been hyper-active—"He would go up and down, up and down, always moving, constantly moving,"

remembers Richard McGalem. Richard would take the boys to a local park and let them run free in an attempt to drain them of their energy. "It never worked for Brian. It wouldn't matter how long we spent at the park. We could never calm him," he recalls. But school changed the boy. His hyperactivity didn't wane—he was as excitable as ever. It was tinged with something else, though, something darker. Brian, otherwise good-natured and cheerful, now seemed agitated. What the parents had thought of as a mere nuisance of hyperactivity turned into a behavioral concern. Elementary school was the first time the McGalems realized that Brian's characteristic energy was not simply a quirk of his personality. Several trips to medical professionals later, the McGalems had their answer: Brian was diagnosed with ADHD. The school recommended that he be removed from general education classes and placed in special education courses. Brian's whole world changed.

"I never thought I belonged in the classes that I was in," recalls Brian McGalem. "Back then, they pulled you out and put you with all the other kids that needed special attention. I didn't like it. It was like everyone knew there was something wrong with me." Victoria McGalem echoes her son's sentiment. "After they put Brian in those classes, he changed. He grew up thinking he was less than the rest of the kids—the ones not in special education classes. Brian was in there with children with severe learning and physical disabilities. He just needed to sit down and focus, but everyone else had these very serious diagnoses. I think Brian was ashamed to be there." Compounding problems was Victoria's utter inability to tend to Brian's heightened needs. "I worked too much. I know that now. I was a terrible mother—a terrible mother. My job as an EMT never let me stay home. And when I wasn't working there, I took on side jobs with private patients. By the time I *was* home I was angry, impatient. I took it out on my children. I took it out on Brian most of all." Brian is disengaged and cool when recounting his mother's

treatment. "I think she was maybe frustrated because of how much I moved around. I couldn't focus. I could never focus. The doctors gave me pills to take, but I never really trusted them. Sometimes I would take them for a while, but then I would stop. It probably made me hard to deal with as a kid, I guess." Victoria, however, is more candid and emotional when describing her parenting of young Brian. "I was gone too much. I was gone all the time. When I was there, I was mean," she recalls through tears. "I was a horrible mother. I couldn't deal with how wild he was. He would never sit down, would never pay attention. I thought he was doing it on purpose just to aggravate me. So, I would beat him. God help me, I would beat my son. I would yell at him and call him names. I'd call him so many names. My husband was more patient, but I was a monster. I am so ashamed."

Brian's difficulties at home and school weren't the only issues he grappled with. In middle school, Brian had made an acquaintance with another young boy, Hector. Brian had never particularly warmed to Hector, but Victoria attributed her son's antipathy to the boy's physical appearance. Hector had had some disease that created malformations in his extremities. As a result, his right ear folded into itself and distinguished him from the other children. Victoria had been disappointed in what she perceived to be Brian's prejudice, and goaded her youngest child into spending time with the boy. Over time, Brian retreated further and further into himself, but Victoria blamed the change in temperament on typical growing pains. Brian was already demonstrably unhappy with his special education designation in school, and to her, his outwardly showing of moodiness was a byproduct of that. Also, Brian was a pre-teen; Victoria knew from her other two sons that adolescence was a trying time for any boy. It wasn't until years later that Brian revealed, in tiny increments at a time, that Hector had taken sexual advantage of him. Brian had relented and given into Hector's pressures, but was devastated in the aftermath.

For his part, Hector wanted nothing to do with Brian, choosing to ignore the boy at every opportunity. Still, Victoria McGalem, never knowing what had transpired between the two boys, forced Brian to spend time with Hector, furthering his torment. Years later, when Brian confessed the truth of the situation to his mother, Victoria was shocked. Once again, she questioned her capacity as a mother, blaming herself for her inability to see the trauma her son endured. "I carried my own shame. I was raped by a family friend when I was just a girl. My mother had died when I was very young, and my father raised all five of us by himself. When I was nine years old, my father took in another family that had suffered a similar loss. The brother of the woman who came to stay with us raped me." Victoria is unable to relay any of this account without waves of sobs overtaking her. "I kept it a secret for so long. I didn't tell anyone, anyone in the world, until I met Richard. Later, I kept it from my sons. I kept it from my sons until they were fully grown. I watched over them and worried constantly—I worried that someone would hurt them, that someone would take advantage of them. Maybe that's why I was so mean, so unkind. I didn't want anyone to hurt them. It affected my ability to show them all the love I had for them. To learn that despite everything, despite everything I had tried, all the things I put into place to protect my sons—that someone had still hurt Brian, it was devastating. I thought I would die, it hurt so bad. And I'd forced him to spend time with him. I'd driven him. I did that. I thought I would die when he told me." Brian is very matter-of-fact when discussing the circumstances with Hector. He shies away from detail and talks in broader terms, as if ashamed to recount any of it. "I hated Hector," he says. "Nobody knew what happened. I didn't think anybody would believe me. I thought they'd blame me, think I was sick. He used me."

Brian did his best to maintain any semblance of normalcy that he could under the circumstances. The Hector situation was simply another in a long line of secrets he was

burrowing deep inside. He carried the shame of it, the shame of his mother's treatment, the shame of his special education---all of it—silently. He laughed off what he could, ever careful to turn every cloud into a joke, every slight into a clever quip. He had a few friends, and even a girlfriend or two, but he was lonely. He was slowly but surely retreating into himself, keeping the world at bay. He eschewed the medications that his parents and doctors tried giving him. Instead, Brian would order supplements off the internet—energy pills, caffeine pills, pills that touted increased brainpower and focus, pills that calmed his anxiety. He would take a cocktail of them every day and every night. He began smoking marijuana to excess to quiet his mind. Richard and Victoria McGalem worried and questioned the supplements and his growing reliance upon them, but Brian brushed off their fears. His parents were increasingly concerned about the lingering effects these pills would have on Brian's young brain, but they reasoned that he was a homebody. He wasn't going out to parties and drinking and driving. He wasn't getting arrested or sneaking girls into the house. He didn't have any narcotic chemical dependency. All he did was come home and play video games. Subsequently, they set their concerns aside. They didn't think any harm could come from a boy playing video games. It wasn't until years later that the parents found out how wrong they would be.

    Brian managed to graduate high school, and even enrolled in classes at Northern Virginia Community College. Victoria and Richard were shocked to find that Brian actually did well in college. His attendance was perfect. His grades were good. He wasn't simply performing well; Brian was excelling. Brian attributes this success to a change of environment: "No one knew who I was at college. No one knew that I was the Special Ed kid. No one knew that something was wrong with me. I think that helped. I was in a new place and could be whoever I wanted to be." Victoria shares this belief about Brian's transformation: "His disability wasn't on display

anymore. There wasn't a target on his back anymore. We were really hopeful. He seemed to be doing so well. College was good for him."

College *was* good for Brian—until it wasn't. One day, he simply decided that he needed a break. He'd seen Hector walking around campus and had grown anxious at the idea of him ever disclosing what had transpired between the two of them. "I thought he would see me and tell everyone what had happened. I couldn't take the idea of him telling." His struggles were further compounded by an overall feeling of disconnection from other students on campus. He was also a General Studies major and didn't think he had a clear focus or direction. He wanted to take some time and figure out what he wanted to be. To fill the gaps, Brian became a barista at a local coffee shop. He lived with his parents and his older brothers who were still at home. He occasionally spent time with friends. But his real passion was video games. "He would drink these huge coffees that he'd get from work and take all these caffeine pills," Victoria recalls. "Richard and I didn't understand and we worried. We didn't know what effects all of that caffeine would have on his brain, or on his heart. I knew it wasn't good. He would just tell us he had to stay awake. We didn't know what for. But he said he had to stay awake." Brian *would* stay awake. He would work his shifts at the coffee shop all day, and stay up all night playing video games online. It was a never-ending cycle. On the days when he didn't work, Brian would sleep all day to be prepared to stay up all night. He was quickly devolving into an isolated world where the only reality he knew was a virtual one. Brian didn't realize it then, but he was setting himself up for disaster. The fake world he was creating for himself, coupled with some terrible decision-making and a darkly deep secret would put him on a collision course for the greatest mistake he would make in his life.

**<u>ARGUMENT</u>**

**I.      Legal Standard**

Since the Guidelines were held to be only advisory in *United States v. Booker*[1], imposing a sentence is no longer a simple mathematical exercise. And while "[A] district Court shall fist calculate (after making the appropriate findings of fact) the range prescribed by the Guidelines,"[2] they must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range."[3] Even then, the range is but one of several factors a Court must consider when imposing a sentence, and it is legal error to treat those ranges as default sentences.[4] A Court must also weigh the factors enumerated in 18 U.S.C. § 3553 (a) when imposing a sentence.

Giving consideration to all of the 18 U.S.C. § 3553 (a) factors, a district judge must "impose a sentence sufficient, but 'not greater than necessary' to accomplish the goals of sentencing."[5] Courts need not point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States* 552 U.S. 38, 47. A below-Guidelines sentence may be appropriate if the district Court determines that "the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee), the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the case warrants a different sentence regardless."[6] After calculating the total offense level and providing "both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the 18 U.S.C. § 3553 (a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50.

---

[1] *United States v. Booker*, 543 U.S. 220,226 (2005)
[2] *United States v. Hughes*, 401 F. 3d 540,546 (4th Cir. 2005)
[3] *Gall v. United States*, 552 U.S. 38, 50 (2007)
[4] *United States v. Mendoza-Mendoza*, 597 F. 3d 212,216-17 (4th Cir. 2010); Nelson v. United States, 555 U.S. 350, 352 (2009) (per curiam)
[5] Kimbrough v. United States, 552 U.S. 85, 101 (2007) quoting 18 U.S.C. § 3553 (a).
[6] *Rita v. United States*, 551 U.S. 338,351 (2007).

The factors for the district Court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kind of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence: to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to the defendant and others; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553 (a). A district Court must weigh each of these factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to 18 U.S.C. § 3553 (a). *Id.*

I. **A Sentence Of The Fifteen Year Mandatory Minimum is Sufficient But Not Greater Than Necessary To Achieve the Goals of Sentencing Under §3553(a)**

*i. Nature and Circumstances of the Offense*

Brian McGalem was lonely. That much was clear. A difficult and somewhat isolated childhood had stunted him a bit—created a circumstance of arrested development that had left him socially awkward and ill at ease among strangers. The online world was different. There, on these multi-player platforms where virtual reality world-building was the only reality, everyone was his peer. No one knew who he was or what he'd endured. He was just there to play—to have a good time—to make friends.

And Brian *did* make friends. He was suddenly surrounded by scores of people who respected his game-playing prowess. He'd stay up all night talking through headsets to complete strangers who became familiars. He met them all every night where the fantasy world he fashioned

blurred the lines of the real world he left behind. But his new friends weren't all adults. Many were children, and what was initially a shared interest in a pastime that transcended age descended into something much darker.

At first Brian thought little of his communication with his online friends. They were young, but they were merely video game counterparts. He didn't see anything wrong with their engagement. But at some point, things became confused inside of Brian. He'd had very little sexual experience to speak of, and he was having a difficult time reconciling the affection he was beginning to feel for his new acquaintances. The secret of his feelings ate away at him. He didn't have anyone to talk to, anyone to ask about the subversive thoughts that were beginning to invade his every interaction. Ultimately, Brian gave in. He crossed a line he never should have crossed and began having sexual conversations and exchanging pictures with the boys. His rational mind knew what he was doing was wrong, but Brian tried to tell himself that everything was fine because he wasn't actually *meeting* the boys, wasn't actually *touching* the boys. He reasoned that he was being inappropriate, being dirty even, but he wasn't *abusing* them or using them the way *he'd* been used. Still, shame covered him like a blanket. The secret suffocated him and he retreated even further into his dark world, separating himself from his family and friends for fear of ostracization. An unintended outcome was that his self-imposed isolation took him further and further into the gaming world, and in continued contact with the boys he was victimizing.

There is no explanation for what Brian McGalem did, and certainly no justification or excuse. He violated the trust of those boys in such an unspeakably profound way, and there is no way for him to right this wrong. The worst of it was that Brian carried on with these boys, abusing their friendship, and traumatizing them in a way that he, himself, was all too familiar with. When he thinks of it he is filled with an overwhelming sense of disgust, and is so wracked

by guilt that he often wakes up in the middle of the night, haunted by the sins of his past: "I don't know why I did it. I can't explain it. I don't have an answer as to why I did this. I'm just all mixed up. I'm all mixed up."

Grief and shame have consumed every moment of Brian's existence in the aftermath of these events. When he was first arrested, Brian struggled with suicidal ideation, believing that he had no place in this world, believing that he was better off dead. He was transported to a facility in Wilmington, Delaware better equipped to handle inmates with mental health struggles. There, Brian has been able to sit with his crimes and begin to take accountability for his actions. For years, he'd tried to push aside thoughts of what he was doing to those boys. For years he'd tried to tuck it quietly away into the recesses of his mind during daylight hours, hoping that the scattered rationalizations he offered himself were enough to ease his guilt. But when it all came to light, the weight of what he'd done overwhelmed him and he couldn't physically tolerate being inside of his own skin. He grapples with it to this day.

There is no way to determine the amount of pain that Brian caused those children, now older and even more acutely aware of the harm they've endured. He did an unspeakably horrible thing, and there is no answering for it. He cannot turn back time, he cannot offer compensation for the loss of his innocence, he cannot make them whole. But he is genuinely and immeasurably sorry for what he has done. It is a small comfort—indeed, it may be no comfort at all—but it is true. Simply living with the reality of the harm he committed devastates him every day of his life.

There is no debating that Brian must be held accountable for his actions. The only way he can begin to make amends for the grievous wrong he's committed is with the sacrifice of his freedom, and he wholly accepts this. As such, the fifteen year mandatory minimum period of

incarceration that Brian will serve is more than sufficient punishment for his behavior. It is important for this Court to realize that Brian doesn't have to spend a lifetime in prison for justice to be actualized. Effectively sentencing him to a life sentence won't undue what he's done. And while there is value in accountability and some measure of resolution in punishment, there is also currency in mercy. This is not a man who has spent his entire life in the posture of predation—to the contrary, Brian was himself a victim of exploitation. He, himself, was taken advantage of. But Brian was too committed to suppressing the parts of him that hurt instead of healing them properly. He never learned to give voice to anguish, never had healthy relationships or safe spaces to work through the years of sadness, and loneliness that swallowed him whole.

There is no way to sufficiently quantify the depths of harm Brian's own situation with Hector did to him. The event mapped out a blueprint for his whole life and set him on a course to where he is today. Hector never answered for his treatment of Brian and Brian subsequently internalized and normalized it for years, never seeking help, never disclosing the whirlwind of damage that contextualized his own poor decisions. Even a cursory overview of Brian's life prior to the events that bring him before this Court reveals a history characterized by a good deal of personal suffering. Obviously, the harm Brian experienced doesn't absolve him of his crimes, but it should have some mitigatory effect on this Court's deliberations. Hurt people often hurt people. What he did was unconscionable—but a period of incarceration beyond the fifteen year mandatory minimum in this case is unduly harsh and inhumane. Brian McGalem deserves to be punished. He does not deserve to spend his entire life in prison.

      *ii. History and Characteristics of Defendant, Need to Protect the Public, Deterrence*

The instant offense will be the first felony conviction Brian McGalem has ever had. Prior to this charge, Brian had begun getting his life back on track. He had a job that he loved. He was considering returning to college. He was trying to build a life that he could be proud of, a life that his parents could be proud of. He certainly never thought he would find himself in a federal court facing a lifetime in prison, away from everything he knows and everyone he loves. He continues to reflect about the harm he's caused, as well as the harm he *could have caused*, to this day. In a letter identified as Defendant's Exhibit 1, Brian writes, "I understand the pain I caused to the people who were around me and the potential harm I could have caused if I remained continuing the same actions I was taking at the time."[7]

While incarcerated, Brian has availed himself of the 6 for 1 Program, an intensive course meant to walk offenders through the poor choices that led them to their current circumstances. The program allows inmates to take stock of their lives and reorient themselves to more appropriate coping strategies. The 6 for 1 program also works to realign inmates' thought processes to minimize likelihood of recidivism. Brian has taken great pride in the work he's done throughout the course. "I'm learning how to re-work my thoughts so that they're beneficial to me and not harmful to others," he says.

Brian McGalem will be 25 years old in December of this year. In many ways, he's little more than a kid himself. He has lived almost his entire life under his parents' roof, occupied his time with menial jobs and video games, and still functions much as he did when he was in high school. He doesn't have a history of predation. The choices that bring him before this Court, horrific as they are, are the result of sickness. While he certainly is responsible for his actions, the driving force behind Brian's behavior is mental illness. He didn't choose the subversive thoughts

---

[7] Defendant's Exhibit 1, Letter from Brian McGalem.

that plagued him--he wouldn't. Brian is disgusted by himself and disgusted by his actions. He is deeply ashamed of what he's done and so truly remorseful for the harm he's caused. But Brian McGalem is sick. What he needs, more than anything, is intensive treatment to remedy his maladaptive coping strategies and address his deviant thinking.

Brian acknowledges that he needs to be held accountable, but a period of incarceration beyond the fifteen year mandatory minimum would be excessive, and would serve no purpose. For far too long, this country has satisfied itself with punishment as crime's only answer, but a carceral response is not the only one to be had. Brian McGalem is a young man who hasn't even begun to see the world. He hasn't left home. He hasn't experienced life beyond the safety of his parents' doorstep. There is so much time left for him to change—for him to re-organize his thinking in a more structured, healthy way. There is time for him to both atone for his crimes while also planning for a future beyond them. He can be rehabilitated. He can turn his entire life around.

Brian realizes that he must answer for his mistakes and pay a price for his actions. It is, however, important for this Court to take accurate measure of the man that he is now. He has taken ownership of the wrong he committed and accepted responsibility for his crimes. He has taken steps to mitigate that wrong in electing to enter a plea of guilt rather than put his accusers and their families through the trauma of a trial. While it is certainly the duty of this Court to impose a punishment for what he's done, this Court must also consider the fact that Brian, himself, was a victim of harms he never addressed. He is a person who didn't seek help for pain that ate away at him for years, who didn't address the unresolved issues in his past. He is a man who made a horrible, horrible mistake during an awkward time in his life.  But his transgressions, as awful as they are, represent the sum total of his criminality. He is deeply sorry for the pain he's caused, for

the mistakes he's committed, for the lives that he's forever altered by his actions. But he needs intensive psychiatric help, not a lifetime in prison.

Justice doesn't demand over-punishment. It doesn't require cruelty or the privation of a man's entire life. This Court should examine the life Brian McGalem has led, the things he, himself, has endured, and take full stock of how such a person would end up in this position. In so doing, it will find that Brian, however flawed, is not a monster. He is as deserving of mercy and saving as any other fallen, broken person who was never given an opportunity to heal. This Court can punish him—this Court *should* punish him, but it should also have empathy for the horrors Brian, himself, suffered. The mandatory minimum of fifteen years is more than sufficient to meet the aims of justice in this instance. Mandatory minimums are not meant to be insignificant penalties; their very existence signifies how serious an offense is. These sacrifices and losses are what Brian deserves; a fifteen-year sentence is a punishment that suits the crime. A period of incarceration beyond that fifteen years, however, is a life sentence. Brian will grow old in jail. His parents will age and perhaps not live to see their youngest child free again. He will miss out on monumental milestones that his peers and siblings will experience, and he will have cruelly suffered, *without* end for decades. It is too harsh a penalty once one considers the extent of what he's lived, and the trauma that he, himself has survived.

## **CONCLUSION**

WHEREFORE for the reasons stated above, the Defendant, Brian McGalem, respectfully asks this Court to sentence him to the mandatory minimum, a period of fifteen years of active incarceration.

BRIAN McGALEM,
By counsel

PATRICK ANDERSON & ASSOCIATES, P.C.

_____/s/_____
Jessica Richardson, Esquire
333 N. Fairfax Street Ste. 310
Alexandria, Virginia 22314
Virginia State Bar No. 90158
P: 703-519-7100
F: 703-519-7104
jrichardson@pnalaw.com
Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of November, 2022, I electronically filed the foregoing Sentencing Memorandum using the ECF system, which will send a notification of such filing (NEF) to the following:

Whitney Kramer, Esquire
2100 Jamieson Avenue
Alexandria, Virginia 22314
703-299-3700
Whitney.kramer2@usdoj.gov

Jonathan Keim, Esquire
2100 Jamieson Avenue
Alexandria, Virginia 22314
703-299-3700
Jonthan.keim@usdoj.gov

                            PATRICK ANDERSON & ASSOCIATES, P.C.

                          _____/s/_____
                          Jessica Richardson, Esquire
                          333 N. Fairfax Street, Suite 310
                          Alexandria, Virginia 22314
                          Virginia State Bar No. 90158
                          P: 703-519-7100
                          F: 703-519-7104
                          jrichardson@pnalaw.com
                          Counsel for Defendant